# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| DONALD J. KOMA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER PARTNERS GP, L.P, ENERGY TRANSFER PARTNERS, L.L.C., ENERGY TRANSFER EQUITY, L.P., KELCY L. WARREN, TED COLLINS, JR., MICHAEL K. GRIMM, MARSHALL S. McCREA, JAMES R. PERRY, MATTHEW S. RAMSEY, and DAVID K. SKIDMORE,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief based upon, among other things, the investigation of counsel as to all other allegations herein, as follows:

## SUMMARY OF THE ACTION

1.     This is a unitholder action brought by Plaintiff, on behalf of himself and other holders of the common units of Energy Transfer Partners, L.P. ("ETP" or the "Company"), against ETP, ETP's general partner, Energy Transfer Partners GP, L.P. ("ETP GP"), ETP GP's general partner, Energy Transfer Partners, L.L.C. (all ETP entities collectively will be referred to as "ETP"), and ETP's Board of Directors (the "Individual Defendants" or the "Board"), for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and Rules and Regulations promulgated thereunder, including Rule 14a-9, 17 C.F.R. §240.14a-9, in connection with the proposed merger of ETP with

SXL Acquisition Sub LP ("Merger Sub"), a wholly owned subsidiary of Sunoco Logistics Partners L.P. ("SXL").

2.      ETP is one of the largest publicly traded master limited partnerships in the United States in terms of equity market capitalization.  The Company's primary activities are natural gas operations, liquids operations, and product and crude oil operations.

3.      On November 21, 2016, ETP and SXL jointly announced that they had entered into a definitive agreement pursuant to which ETP would be acquired by SXL in a unit-for-unit transaction.  Pursuant to the Agreement and Plan of Merger, dated November 20, 2016, and the Amendment No. 1 to the Agreement and Plan of Merger, dated December 16, 2016 (collectively, the "Merger Agreement"), Merger Sub, a wholly owned subsidiary of SXL, will merge with Energy Transfer Partners, L.P., with Energy Transfer Partners, L.P. continuing as the surviving entity and becoming a wholly owned subsidiary of SXL. Concurrently, Sunoco Partners LLC, the general partner of SXL ("SXL GP"), will merge with Energy Transfer Partners GP, L.P., the general partner of ETP, with ETP GP continuing as the surviving entity and becoming the general partner of SXL and an indirect wholly owned subsidiary of Energy Transfer Equity, L.P.

4.      Under the terms of the Merger Agreement, holders of common units representing limited partner interests in ETP will receive, for each ETP common unit held, 1.5 common units representing limited partner interests in SXL.  Holders of ETP's Series A Cumulative Convertible Preferred Units will receive an equal number of SXL preferred units, with the same rights, preferences, privileges, duties and obligations that such Series A units had immediately prior to the closing of the merger, subject to certain adjustments in accordance with the ETP partnership agreement (the "Proposed Transaction").

5.      The merger consideration to be received by holders of ETP common units was valued at $39.29 per unit based on the closing price of SXL common units as of November 18,

2016, the last trading day before the public announcement of the merger, representing a discount to the closing price of ETP common units on November 18, 2016, and a *de minimis* 5% premium to the volume-weighted average closing price of ETP common units for the five trading days ended November 18, 2016.

6.      Consistent with the foregoing, on November 21, 2016, SeekingAlpha.com published an article entitled "Sunoco Logistics Partners Has Advantage In Merger With Energy Transfer Partners," observing  that "[e]ffectively, ETP unitholders are not receiving any premium based on the closing prices of the prior day."  Further, the article noted that there "is a significant dividend cut for ETP shareholders" and "SXL shareholders are at an advantage," but the merger is nevertheless expected to be approved because ETE "is likely to be controlling the votes."  The article reported, in pertinent part:

> Following the news of the merger, both SXL and ETP are selling off. SXL is currently down by 7.9% and ETP is down by 8.4%. I attribute the selloff to the fact that ETP shareholders will see a dividend cut by about 30%. ETP currently yields 10.7%; and once they convert into SXL shares, the effective dividend yield will become 7.8% - which is the yield paid by SXL - since ***there is no premium involved in the transaction***. ***This is a significant dividend cut for ETP shareholders***.[1] We should note, however, that this is positive for the combined entity as it will allow to significantly reduce its debt in the future.
>
> The way it looks, ***SXL shareholders are at an advantage here*** because they are likely to see their dividend grow at a faster pace going forward. ETP shareholders are at a disadvantage as they will see a dividend cut. ***I expect that the merger will go through anyway, because the ETE, the parent company of both SXL and ETP, is likely to be controlling the votes.***

7.      As noted in the Proxy (defined below), between 2017 and 2019, the pro forma impact of the Proposed Transaction is expected to be an up to ***20.1% reduction*** of distributable cash flow for ETP's unitholders and up to a ***10.5% increase*** for SXL unitholders.

---

1 Unless otherwise noted, all emphases are added.

8.      In addition, the Chief Executive Officer, Chief Commercial Officer, President and Chief Financial Officer of the combined partnership will be defendant Kelcy Warren, defendant Marshall McCrea, defendant Matt Ramsey and Tom Long, respectively. Further, the members of the Board will serve as members of the board of the post-merger company and the Board will become responsible for managing ETP GP as the general manager of SXL.

9.      As detailed herein, the Proposed Transaction is essentially an insider (*i.e.*, SXL) buyout of ETP that was facilitated by ETE, its affiliates, and conflicted insiders common to ETP, SXL, and/or ETE. The Merger Agreement is the product of an unfair process that lacked safeguards to ensure that ETP's public unitholders were not taken advantage of (as they were) by ETE and SXL. In fact, even ETP's advisor, Barclays Capital Inc. ("Barclays"), was conflicted due to its substantial, only partially disclosed, ongoing ties to ETE and SXL.

10.     To induce unitholders to vote in favor of the Proposed Transaction, on December 19, 2016, in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9, Defendants filed, or caused to be filed, a materially false and/or misleading prospectus and proxy statement (the "Proxy"), incorporated into the Form S-4 Registration Statement (the "Registration Statement") filed by SXL with the U.S. Securities and Exchange Commission (the "SEC"). Among other things, the Proxy contains the unanimous recommendation of the Board and the conflicts committee of the Board that ETP unitholders vote "for" the proposal to adopt the Merger Agreement. However, the Proxy misrepresents and omits material information concerning, among other things: (a) the background and process that led to the Proposed Transaction; (b) ETP and SXL's managements' financial projections; (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinion provided by ETP's financial advisor, Barclays; and (d) the conflicts of interest affecting, among others, Barclays.

11.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

13.     Venue is proper pursuant to 28 U.S.C. §1391(b) because Defendants systematically conduct business on a regular basis in this District and/or reside in this District, and a substantial part of the events and omissions complained of herein occurred in this District.

## PARTIES

14.     Plaintiff is, and was at all times relevant hereto, a common unitholder of ETP.

15.     Defendant ETP is a Delaware limited partnership, with its principal place of business at 8111 Westchester Drive, Suite 600, Dallas, TX 75225.

16.     Defendant ETP GP is a Delaware limited partnership and the general partner of ETP.

17.     Defendant Energy Transfer Partners, L.L.C. is the general partner of ETP GP.

18.     Defendant Energy Transfer Equity, L.P. ("ETE") is a Delaware limited partnership and indirect parent entity of ETP, ETP GP, SXL and SXL GP, with principal offices in Dallas, Texas.

19.     Defendant Kelcy L. Warren has served as Chairman of the Board and the Chief Executive Officer of ETP and has also served as Chairman of the board of directors of ETE.

20.     Defendant Ted Collins, Jr. has served as a Director of the Company.

21.     Defendant Michael K. Grimm has served as a Director of the Company.

22.      Defendant Marshall S. McCrea has served as a Director of the Company and has also served as a member of the board of directors of ETE.

23.      Defendant James R. Perry has served as a Director of the Company.

24.      Defendant Matthew S. Ramsey has served as a Director of the Company and has also served as a member of the board of directors of ETE.

25.      Defendant David K. Skidmore has served as a Director of the Company.

26.      Defendants Warren, Collins, Grimm, McCrea, Perry, Ramsey, and Skidmore are collectively referred to herein as the "Board" or the "Individual Defendants."

27.      The Individual Defendants, ETP, ETP GP, Energy Transfer Partners, L.L.C. and ETE are referred to as "Defendants."

28.      Non-party SXL is a Delaware limited partnership that owns and operates a logistics business, consisting of a geographically diverse portfolio of complementary pipeline, terminalling, and acquisition and marketing assets, having its principal place of business in Newtown Square, Pennsylvania.

29.      Non-party SXL GP is the general partner of SXL.

30.      Non-party Merger Sub is a Delaware limited liability company and a wholly owned subsidiary of SXL.

## SUBSTANTIVE ALLEGATIONS

### Background

31.      Energy Transfer, which is now comprised of, *inter alia*, (i) ETP; (ii) ETE; (iii) SXL; and (iv) Sunoco LP, is a Texas-based company that began in 1995 as a small intrastate natural gas pipeline operator and is now one of the largest and most diversified investment grade master limited partnerships in the United States. Growing from roughly 200 miles of natural gas pipelines in 2002 to approximately 71,000 miles of natural gas, natural gas liquids (NGLs), refined products,

and crude oil pipelines today, the Energy Transfer Family of Partnerships remains dedicated to providing exceptional service to its customers and attractive returns to its investors.

32.     Through several transformative transactions, Energy Transfer expanded its scope of services. While it remains committed to the natural gas industry, it enhanced its diversified portfolio of assets by making a strategic entrance into the NGL business through the acquisition of Louis Dreyfus' NGL storage, fractionation and transportation operations in 2011. In 2012, it acquired Southern Union Company, a leading diversified natural gas company, which expanded its national footprint and added more than 20,000 miles of gathering and transportation pipelines to its portfolio. Energy Transfer made a strong entrance into the crude oil and refined products business by acquiring Sunoco, Inc. in 2012, including its interest in SXL.

33.     Lastly, through the merger with Regency Energy Partners in 2015, it significantly diversified its footprint, both geographically and across business lines. Energy Transfer expanded its reach in the refined products and convenience store business with the acquisition of Susser Holdings Corporation, including its interest in Susser Petroleum Partners LP, (now Sunoco LP - NYSE: SUN). These acquisitions, together with its already robust asset base, have enabled Energy Transfer to become a premier provider of services to producers and consumers of natural gas, NGLs, crude oil, and refined products.

34.     Today, there are four publicly traded partnerships in the Energy Transfer Family: (i) ETP; (ii) ETE; (iii) SXL; and (iv) Sunoco LP.

**ETP's Recent Performance**

35.     On May 4, 2016, ETP issued a press release reporting its financial results for the quarter ended March 31, 2016, which stated, in part, as follows regarding the Company's performance and growth prospects:

> Distributable Cash Flow, as adjusted, for the three months ended March 31, 2016 was $349 million compared to $321 million for the three months ended March 31, 2015,

*an increase of $28 million*. Distributable Cash Flow, as adjusted, per unit was $0.33 for the three months ended March 31, 2016, *an increase of 10% compared to the three months ended March 31, 2015*. ETE's net income attributable to partners was $312 million for the three months ended March 31, 2016 compared to $284 million for the three months ended March 31, 2015, *an increase of $28 million*.

The Partnership's recent key accomplishments and other developments include the following:

- In March 2016, the Partnership completed a private offering of 329.3 million Series A Convertible Preferred Units representing limited partner interests in the Partnership to certain common unitholders ("Electing Unitholders") who elected to participate in a plan to forgo a portion of their future potential cash distributions on common units participating in the plan for a period of up to nine fiscal quarters, commencing with distributions for the fiscal quarter ending March 31, 2016, and reinvest those distributions in Series A Convertible Preferred Units. At the end of the plan period, which is expected to be May 18, 2018, the Series A Convertible Preferred Units are expected to automatically convert into 79 million ETE common units.

- In April 2016, ETE announced a $0.285 distribution per ETE common unit for the quarter ended March 31, 2016, or $1.14 per unit on an annualized basis.

- As of March 31, 2016, ETE's $1.5 billion revolving credit facility had $965 million of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 2.87x.

36.    On August 3, 2016, ETP issued a press release reporting its financial results

for the quarter ended June 30, 2016, which included the following highlights:

- In August 2016, ETP, Sunoco Logistics Partners L.P. ("Sunoco Logistics") and Phillips 66 announced the completion of the project-level financing of the Dakota Access Pipeline and Energy Transfer Crude Oil Pipeline projects (collectively the "Bakken Pipeline"). The $2.50 billion facility is anticipated to provide substantially all of the remaining capital necessary to complete the projects.

- In August 2016, ETP and Sunoco Logistics announced they have signed an agreement to sell 36.75% of the Bakken Pipeline project to MarEn Bakken Company LLC, an entity jointly owned by Enbridge Energy Partners, L.P. and Marathon Petroleum Corporation, for $2.00 billion in cash. The sale is expected to close in the third quarter of 2016, subject to certain closing conditions. ETP and Sunoco Logistics will receive $1.20 billion and $800 million in cash at closing, respectively, and will own a combined 38.25% of the Bakken Pipeline project.

- As of June 30, 2016, ETP's $3.75 billion credit facility had $1.13 billion of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 4.47x.

37.    On October 28, 2016, ETP declared it would distribute $1.055 per unit for the quarter. This quarterly distribution is consistent with what ETP distributed beginning in November 2015. Over the last few years, the distribution steadily increased as summarized in the following table:

| Ex/Eff Date | Type | Cash Amount | Declaration Date | Record Date | Payment Date |
|---|---|---|---|---|---|
| 11/3/2016 | Cash | 1.055 | 10/28/2016 | 11/7/2016 | 11/14/2016 |
| 8/4/2016 | Cash | 1.055 | 7/28/2016 | 8/8/2016 | 8/15/2016 |
| 5/4/2016 | Cash | 1.055 | 4/27/2016 | 5/6/2016 | 5/16/2016 |
| 2/4/2016 | Cash | 1.055 | 1/28/2016 | 2/8/2016 | 2/16/2016 |
| 11/3/2015 | Cash | 1.055 | 10/26/2015 | 11/5/2015 | 11/16/2015 |
| 8/4/2015 | Cash | 1.035 | 7/24/2015 | 8/6/2015 | 8/14/2015 |
| 5/6/2015 | Cash | 1.015 | 4/29/2015 | 5/8/2015 | 5/15/2015 |
| 2/4/2015 | Cash | 0.995 | 1/26/2015 | 2/6/2015 | 2/13/2015 |
| 10/30/2014 | Cash | 0.975 | 10/22/2014 | 11/3/2014 | 11/14/2014 |
| 7/31/2014 | Cash | 0.955 | 7/24/2014 | 8/4/2014 | 8/14/2014 |
| 5/1/2014 | Cash | 0.935 | 4/24/2014 | 5/5/2014 | 5/15/2014 |
| 2/5/2014 | Cash | 0.92 | 1/29/2014 | 2/7/2014 | 2/14/2014 |
| 10/31/2013 | Cash | 0.905 | 10/23/2013 | 11/4/2013 | 11/14/2013 |
| 8/1/2013 | Cash | 0.894 | 7/26/2013 | 8/5/2013 | 8/14/2013 |

38.    On November 9, 2016, ETP issued a press release reporting its financial results for the quarter ended September 30, 2016, which included the following highlights:

- On November 1, 2016, ETP acquired certain interests in PennTex Midstream Partners, LP ("PennTex") from various parties for total consideration of approximately $640 million in ETP units and cash.

- As of September 30, 2016, ETP's $3.75 billion credit facility had $1.58 billion of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 4.26x.

**The Defective Sales Process and Related Omissions in the Proxy**

39.     According to the Proxy, in early October 2016, management of ETE, ETP and SXL commenced preparation for semi-annual meetings of the board of directors of each of these entities to be held between October 17 and October 19.   In connection with these preparations, management of each of these entities *reviewed information related to* current and *projected financial performance, including projected financial performance under various assumptions related to future crude oil, natural gas and natural gas liquids prices, expected timing for completion of capital expenditure projects, projected debt levels and leverage ratios and other matters*. *Based on this information, management of ETE analyzed various options to improve the distribution coverage ratios and leverage ratios at ETP and SXL under various assumptions related to future financial performance, including the possibility of a merger of ETP and SXL*. Despite the materiality of the projected financial information and its significance to the various alternative options available to ETP common unit holders, the Proxy fails to disclose the full breadth and scope of the projections or any details of the various options considered.

40.     On October 19, 2016, ETE management had an informal discussion with the Board and the board of directors of LE GP, LLC, the general partner of ETE (the "ETE Board"), regarding the possibility of a merger of ETP and SXL.

41.     On November 1, 2016, Michael J. Hennigan, President and Chief Executive Officer of SXL, held a call with the members of the standing SXL Conflicts Committee to advise them of his discussions with defendant Warren.  On November 1, 2016, the Board and ETE Board held a joint meeting to discuss ETP management's analysis related to a potential merger transaction between ETP and SXL and the expected structure for such transaction. According to the Proxy,

the Board determined that any such transaction would be subject to review and approval of the ETP Conflicts Committee and determined to appoint David K. Skidmore and Michael K. Grimm to the ETP Conflicts Committee. However, the Proxy fails to disclose the exigency that led to the appointment of the committee, including whether it was a requirement under applicable partnership agreements; or how its members were selected and/or vetted to identify potential conflicts of interest.

42.     On November 4, 2016, the ETP Conflicts Committee held a telephonic meeting with its legal counsel, Potter Anderson & Corroon LLP ("Potter Anderson"), to discuss potential financial advisors to the ETP Conflicts Committee. The ETP Conflicts Committee determined to further explore engaging Barclays.

43.     On November 5, 2016, the ETP Conflicts Committee determined to engage Barclays. However, the Proxy fails to disclose whether the Board considered Barclays' long standing relationship with, and substantial investments in, both ETE and SXL, both of which are parties to the Merger Agreement that possess discreet material interests in the consummation of the Proposed Transaction. Critically, the Proxy fails to disclose whether and how these conflicts were addressed, and if and when the Board determined that Barclays was impartial. In fact, as reported by Bloomberg, but omitted from the Proxy, Barclays is heavily invested in SXL and is the 19th (out of 387) largest holder of SXL units, with a position equal to approximately 1.07% of the outstanding units, larger than all SXL insider holdings combined. In contrast, and also not disclosed in the Proxy, Barclays is the 34th (out of 679) largest holder of ETP units, holding approximately 0.31% of the outstanding units, nearly 50% more than all ETP insiders combined. Similarly, Barclays is the 30th (out of 462) largest holder of ETE units, holding approximately 0.25% of the outstanding units, more than the majority of ETE's insiders' holdings.

44.     Thus, Barclays' (undisclosed) interests in the parties to the Merger Agreement rendered Barclays highly conflicted and the Proxy fails to disclose if and when this conflict was considered and/or resolved by the ETP Conflicts Committee. Given that Barclays' SXL holdings are significantly larger than its ETP holdings, Barclays is positioned to substantially profit from the inadequate proposed consideration in the Proposed Transaction, which will inure to the benefit of SXL holders.

45.     On November 8, 2016, the ETP Conflicts Committee held a telephonic meeting to discuss the structure and rationale of the proposed transaction, the role of ETE in connection therewith, the exchange of diligence information, including financial projections, and the anticipated process regarding exchange of proposals and negotiations between the ETP Conflicts Committee and the SXL Conflicts Committee. However, the Proxy fails to actually identify ETE's role in connection with the Proposed Transaction. This omission is even more significant in light of the fact that ETE participated in many of the deal-related Board meetings and their concession on certain financial terms was critical to any potential sale of ETP.

46.     According to the Proxy, on November 10, 2016, ETP furnished Barclays with a *financial model* for purposes of Barclays' analysis, but the Proxy fails to disclose the details or nature of this model.

47.     On November 11, 2016, Mr. Warren sent a letter to the SXL Board, which indicated that *ETE believed that it would be advisable for SXL to consider making a proposal to acquire ETP* in an all equity transaction in which the equity exchange ratio would be based on a volume weighted average price for the common units of each of SXL and ETP, with an appropriate premium being offered to the ETP common unitholders based on SXL's analysis. The Proxy fails to disclose ETE's incentives or interest in connection with the Proposed Transaction or why its proposal was relevant.

48.     The letter also indicated that, as SXL would be the acquiring entity in this transaction, ***the existing structure of incentive distribution rights in SXL embedded in the current SXL partnership agreement would continue following the closing of the transaction***. However, the Proxy fails to disclose the potential, or expected, value of the "incentive distribution rights in SXL embedded in the current SXL partnership agreement," how it could or would vary, and its interplay, if any, with value and form of the proposed consideration.

49.     The letter further indicated that ***ETE would evaluate and assist with any transaction that SXL would consider proposing to ETP and, in light of ETE's various rights under the partnership agreements and limited liability company agreements related to the general partners of each of SXL and ETP, ETE would be prepared to take appropriate action to consent to a transaction between SXL and ETP that ETE determines is beneficial to the unitholders of ETE.*** However, the Proxy fails to disclose what measures the Board took, if any, to neutralize the conflicts of interest relating to the fact that ETE sat on both sides of the negotiation and also fails to disclose "ETE's various rights under the partnership agreements and limited liability company agreements related to the general partners of each of SXL and ETP" and its impact on the pricing or structure of a potential transaction, including the Proposed Transaction.

50.     Following the delivery of this letter, Mr. Mason had telephonic conversations with Mr. Hennigan, and a representative of Richards, Layton & Finger, P.A. ("RLF"), legal counsel to the SXL Conflicts Committee, to clarify that, ***based on this transaction structure, the then existing SXL incentive distribution subsidies would continue following the closing of the proposed transaction but that, due to the extinguishment of the incentive distribution rights in ETP in connection with ETP being merged with a subsidiary of SXL pursuant to the proposed transaction structure, the corresponding ETP incentive distribution subsidies provided for in the ETP partnership agreement would also be extinguished.*** The Proxy fails to disclose how and

when this proposed structure was developed and whether the parties ever considered an all-cash or mixed cash/stock transaction. Moreover, the Proxy fails to disclose the nature, details and value of "the incentive distribution rights in ETP" or "the corresponding ETP incentive distribution subsidies provided for in the ETP partnership agreement" which were to be extinguished in connection with the proposed transaction structure. Finally, the Proxy fails to disclose the relationship between the various distribution rights and subsidies on the one hand, and ETE's credit metrics on the other. Given the significance of the various subsidies and distribution rights, ETP's public unitholders cannot understand the process, negotiations, and, ultimately, the factors that guided the Proposed Transaction.

51.     On November 14, 2016, a presentation was made regarding ETP's business and operations, including a review of each of ETP's business segments and *future expected growth projects*. *The representatives of ETP also reviewed the financial projections for the business and later provided SXL, the SXL Conflicts Committee and Citigroup Global Markets Inc. ("Citi"), financial advisor to the SXL Conflicts Committee, with electronic copies of the presentation, which included the financial projections*. Yet, despite the materiality of these projections to the bankers and respective board members, the Proxy fails to fully and accurately disclose these projections and if/how they differ from the limited projections included in the Proxy.

52.     At the November 14th meeting, following the ETP presentation, Mr. Hennigan and Peter Gvazdauskas, Chief Financial Officer and Treasurer of SXL, also provided a presentation to the group regarding SXL's business and operations, including a review of SXL's crude oil projects, NGL projects and refined products projects. *The representatives of SXL also reviewed the financial projections for the business and later provided ETP, the ETP Conflicts Committee and Barclays with electronic copies of the presentation, which included the financial projections*. Yet again, despite the materiality of these projections to the bankers and respective board members,

the Proxy fails to fully and accurately disclose these projections and if/how they differ from the limited projections included in the Proxy.

53.     On November 16, 2016, the SXL Conflicts Committee and the ETP Conflicts Committee held an in person meeting during which the SXL Conflicts Committee proposed (the "SXL Initial Proposal") that SXL acquire ETP in a transaction in which (i) ETP common unitholders would receive a number of SXL common units at an exchange ratio reflecting a 5.0% discount to the spot trading price for the ETP common units, (ii) all nonaffiliated holders of SXL common units would receive a onetime special distribution of $2.00 per SXL common unit prior to the closing of the merger, which would be funded through borrowings under SXL's credit facility, (iii) in addition to any required ETP approvals, the transaction would be conditioned on obtaining the approval of holders of a majority of outstanding SXL common units, (iv) ETE would approve additional SXL incentive distribution subsidies in the amount of $125.0 million per quarter for the first four quarters following the closing of the merger and $40.0 million per quarter for the fifth through twelfth quarters following the closing of the merger and (v) all existing ETP incentive distribution subsidies and SXL incentive distribution subsidies currently in place would remain in place following the closing of the merger.

54.     On November 17, 2016, Vinson & Elkins L.L.P. ("V&E") sent an initial draft of the Merger Agreement (which did not address the economic terms of the merger) to Latham & Watkins LLP ("Latham"), legal counsel to ETP, Potter Anderson, ETP and ETE. Consistent with the SXL Initial Proposal, the draft Merger Agreement included a requirement that holders of a majority of outstanding SXL common units vote to approve the transaction. The draft Merger Agreement also contained a "no shop" covenant that would permit the Board to change its recommendation to the ETP unitholders that they vote in favor of the merger only upon changed

circumstances and would not allow the Board to respond to any inquiries from third parties regarding an alternative transaction.

55.     On November 17 through November 18, 2016, meetings were held to discuss issues identified in SXL's initial draft of the Merger Agreement. The key issues discussed included (i) the "no shop" covenant, (ii) the requirement that holders of a majority of outstanding SXL common units vote to approve the transaction, (iii) the restrictions on ETP's and SXL's ability to engage in certain business activities after the execution of the Merger Agreement and prior to closing, (iv) the representations and warranties given by ETP and SXL and (v) the remedies and termination provisions.

56.     On November 18, 2016, the ETP Conflicts Committee held a series of meetings with representatives from Barclays and Potter Anderson to further discuss the merits of the SXL Initial Proposal and possible responses thereto. During one of these meetings, Messrs. Long and Mason reported to Barclays and the ETP Conflicts Committee that it was ***ETP management's belief that it is likely that ETP would need to reduce its quarterly distributions by 15% to 25% from the current distribution levels for 2017, 2018 and 2019, and that assuming reductions in this range, ETE would likely seek to renegotiate the ETP incentive distribution subsidies currently in effect for 2017, 2018 and 2019 in order for ETE to satisfy the leverage ratio covenants in ETE's existing debt agreements (it being understood that ETP has no obligation to renegotiate such incentive distribution subsidies).*** The Proxy fails to disclose the basis for the belief that ETP would need to reduce its current distribution levels, whether this view was unanimous, or the interplay between the ETP quarterly distributions and the ETP incentive distribution subsidies. Moreover, these omissions further highlight the materiality of the detailed management projections, which were omitted/misstated in the Proxy, which would allow ETP unitholders to independently assess the reasonableness of ETP's management's "belief" that ETP

would need to reduce its quarterly distributions by 15% to 25% from the current distribution levels for 2017 through 2019. This premise had a significant impact on the valuation analyses used to support the Fairness Opinion relied on by the Board to recommend the Proposed Transaction and, without being able to gauge its reasonableness, it is impossible to determine whether ETP unitholders are being fairly compensated.

57.     The ETP Conflicts Committee subsequently determined to deliver to the SXL Conflicts Committee a counterproposal (the "ETP Counterproposal"), pursuant to which (i) ETP common unitholders would receive SXL common units at an exchange ratio that would equal a 10% premium to the spot trading price for the ETP common units, (ii) SXL would not make a onetime special cash distribution to the SXL unitholders prior to the closing of the transaction, (iii) no SXL unitholder vote would be required to approve the transaction and (iv) all existing ETP incentive distribution subsidies and SXL incentive distribution subsidies would remain in place following the closing of the merger.

58.     On November 18, 2016, the SXL Conflicts Committee met in person, together with its legal and financial advisors, to discuss possible responses to and related matters regarding the ETP Counterproposal. Following discussion, the SXL Conflicts Committee determined to propose (the "SXL Revised Proposal") that ETP common unitholders would receive 1.475 SXL common units for each ETP common unit and that all ETP incentive distribution subsidies and SXL incentive distribution subsidies would remain in place following the closing of the merger. However, the Proxy fails to disclose whether this proposed exchange rate constituted an implied discount or premium to ETP's unit price at the time, or the amount of same.

59.     On the evening of November 18, 2016, Mr. Anderson, the chairman of the SXL Conflicts Committee, held a telephone call with Mr. Skidmore during which he conveyed a SXL Revised Proposal.

60.     On November 19, 2016, the ETP Conflicts Committee determined to propose that ETP common unitholders would receive 1.50 SXL common units for each ETP common unit (the "ETP Revised Counterproposal"), and Mr. Skidmore conveyed the ETP Revised Counterproposal to Mr. Anderson shortly after the meeting. However, the Proxy again fails to disclose whether this proposed exchange rate constituted an implied discount or premium to ETP's unit price at the time, or the amount of same. Indeed, based on information contained in Barclay's analyses, it appears that the ETP Revised Counterproposal represents a discount to ETP's trading price and an abandonment of the provision in the ETP Counterproposal which required that ETP common unitholders would receive SXL common units at an exchange ratio that would equal a 10% premium to the spot trading price for ETP common units.

61.     On November 19, 2016, the SXL Conflicts Committee determined that it would reiterate its proposal that SXL would acquire ETP at a 1.475 exchange ratio. The Proxy again fails to disclose whether this proposed exchange rate constituted an implied discount or premium to ETP's unit price at the time, or the amount of same.

62.     On November 19, 2016, the SXL Conflicts Committee determined that it would accept the proposed 1.500 exchange ratio, subject to final documentation of the transaction prior to opening of the market on Monday, November 21, 2016. And, the Proxy again fails to disclose whether this proposed exchange rate constituted an implied discount or premium to ETP's unit price at the time, or the amount of same.

63.     On November 20, 2016, V&E provided additional comments to the Merger Agreement to Latham, including a proposed termination fee in the amount of 3.5% of the ETP equity value in the event the Merger Agreement was terminated under certain circumstances.

64.     On November 20, 2016, the Board held a joint board meeting with the ETE Board. The ETP Conflicts Committee then advised the Board that it had approved the Merger Agreement

and recommended that the Board approve the Merger Agreement and submit the Merger

Agreement to ETP's limited partners for approval. Following this recommendation, the Board

determined to enter into the Merger Agreement, and the Board approved and adopted the Merger

Agreement and the transactions contemplated thereby, including the merger. Thereafter, the Board

approved and adopted the Merger Agreement and the transactions contemplated thereby.

65.     On November 20, 2016, the parties finalized and executed the Merger Agreement.

**The Proposed Transaction**

66.     On November 21, 2016, prior to the opening of trading on the NYSE, ETP and SXL

issued a joint press release announcing the Proposed Transaction as follows:

> **Sunoco Logistics Partners L.P. (NYSE: SXL) and Energy Transfer Partners,
> L.P. (NYSE: ETP)** today announced that they have entered into a merger
> agreement providing for the acquisition of ETP by SXL in a unit-for-unit
> transaction. The transaction was approved by the boards of directors and conflicts
> committees of both partnerships and is expected to close in the first quarter of 2017,
> subject to receipt of ETP unitholder approval and other customary closing
> conditions.
>
> Under the terms of the transaction, ETP unitholders will receive 1.5 common units
> of SXL for each common unit of ETP they own. This equates to a 10% premium to
> the volume weighted average pricing of ETP's common units for the last 30 trading
> days immediately prior to the announcement of the transaction.
>
> As SXL will be the acquiring entity, the existing incentive distribution rights
> provisions in the SXL partnership agreement will continue to be in effect, and
> Energy Transfer Equity, L.P. (NYSE: ETE) will own the incentive distribution
> rights of SXL following the closing of the transaction. As part of this transaction,
> ETE has agreed to continue to provide all the incentive distribution right subsidies
> that are currently in effect with respect to both partnerships. The transaction is
> expected to be immediately accretive to SXL's distributable cash flow per common
> unit and is also expected to allow the combined partnership to be in position to
> achieve near-term distribution increases in the low double digits and a more than
> 1.0x distribution coverage ratio.
>
> The transaction is expected to provide significant benefits for SXL and ETP
> unitholders as the combined partnership will have increased scale and
> diversification across multiple producing basins and will have greater opportunities
> to more closely integrate SXL's natural gas liquids business with ETP's natural gas
> gathering, processing and transportation business. With this transaction, SXL and
> ETP expect to build upon their experience working together as partners in several

joint ventures to pursue commercial opportunities and to achieve cost savings while enhancing the service capabilities for their customers. SXL and ETP expect that the transaction will allow for commercial synergies and costs savings in excess of $200 million annually by 2019.

The transaction is also expected to strengthen the balance sheet of the combined organization by utilizing cash distribution savings to reduce debt and to fund a portion of the growth capital expenditure programs of the two partnerships. ETP and SXL have spent approximately $15 billion in organic growth capital over the past several years, and these expenditures, combined with the completion of other major capital projects currently in progress, are expected to continue to generate strong distributable cash flow growth.

Both ETP and SXL management teams are pleased to be able to bring two strong partnerships together in this strategic transaction that combines the premier crude oil midstream MLP with the premier natural gas midstream MLP. The combined partnership is expected to be the second largest MLP as measured by enterprise value.

At the closing of the transaction, the Chief Executive Officer, Chief Commercial Officer, President and Chief Financial Officer of the combined partnership will be Kelcy Warren, Mackie McCrea, Matt Ramsey and Tom Long, respectively, and it is expected that Mike Hennigan and other members of the SXL management team will continue in leading management roles of the combined company with the SXL business headquartered in Philadelphia.

SXL and ETP will hold a joint conference call to discuss the transaction details on Monday, November 21, 2016 at 3:00 p.m. Central Time (4:00 p.m. Eastern Time). An investor presentation will be posted to the partnerships' websites and filed with the SEC on a Form 8-K.

The dial-in number for the call is 1-877-524-8416. The investor presentation and a live webcast of the call may be accessed on the investor relations page of SXL's website at www.sunocologistics.com or ETP's website at www.energytransfer.com. The call will be available for replay on those sites or by dialing 1-877-660-6853. A replay of the broadcast will also be available on SXL's and ETP's websites for a limited time.

Advisors

Latham & Watkins LLP acted as legal counsel to ETP. Vinson & Elkins LLP acted as legal counsel to SXL. Barclays acted as financial advisor and Potter Anderson & Corroon LLP acted as legal counsel to ETP's conflicts committee. Citi acted as financial advisor and Richards Layton & Finger, P.A. acted as legal counsel to SXL's conflicts committee.

**The Amendment to the Merger Agreement and Other Developments**

67.     On December 15, 2016, the ETP Conflicts Committee held a meeting with Potter Anderson, during which Potter Anderson discussed certain terms related to the Amendment, and, recommended that the Board approve the Amendment and cause ETP to enter into the Amendment. On December 16, 2016, the ETP Board and ETE Board each approved and adopted the Amendment.

68.     Starting on December 22, 2016, news sources, including the Wall Street Journal, reported that Blackstone Group LP was in talks to "stake in assets owned by [ETP]" and it was not "clear how big the latest deal would be, but … it could be valued at about $5 billion or more."  *See* http://www.wsj.com/articles/blackstone-in-talks-to-take-stake-in-energy-transfer-partners-assets-1482429832.  Details of the possible acquisition were not made available.

69.     As reported on December 23, 2016 by Market Realist, Blackstone Group is in talks with a former CFO of ETP (Jamie Welch) in a deal that could be valued at ~$5.0 billion.  Mr. Welch was replaced due to conflicts related to the merger between ETE and Williams Companies. *See* http://marketrealist.com/2016/12/energy-transfer-group-companies-surged-yesterday.

**The Unfair Price**

70.     The failure of the Individual Defendants to secure an adequate price is apparent from the flawed sales process, which was designed to advantage SXL and deter potential competing bids. Under the terms of the Merger Agreement, ETP unitholders will receive 1.5 common units of SXL for each common unit of ETP.

71.     The proposed consideration, worth approximately $39.29 as of November 18, 2016, is woefully inadequate in light of ETP's true value and growth prospects. According to Bloomberg, analysts' consensus estimate for ETP is $43.81 per unit and at least one analyst following the Company has set a price target of $55 per unit.

72.     Following the announcement of the Proposed Transaction, on November 22, 2016,

Bloomberg published an article entitled "Energy Transfer and the Art of Transference," noting that

ETP unitholders will get a "stealth dividend cut," and the potential synergies do not offset this

upfront cut.  In pertinent part, the article stated::

> ***So ordinary investors in Energy Transfer Partners will get a stealth dividend cut
> instead.*** They will receive 1.5 units of Sunoco Logistics Partners for every unit they
> own. Sunoco Logistics Partners' quarterly dividend is just 51 cents per unit.
> Multiply that by 1.5, and Energy Transfer Partners' investors will see their
> quarterly payout drop from $1.06 to 77 cents -- a cut of 27 percent. Ouch.
>
> *                *                *
>
> This is backed up by the promise of synergies to offset their pain; $200 million a
> year by 2019 in this case. Here are three reasons why investors may roll their eyes
> at this:
>
> First, recall that, during the twisty-turny phase of the Williams saga, Energy
> Transfer took the bold (Pythonesque?) step of trashing its own synergies estimates.
> (I'm guessing these latest ones will stand, though).
>
> ***Second, even taken at face value, those synergies, discounted at 10 percent and
> assuming $100 million of upfront costs, are worth perhaps $2 per Energy
> Transfer Partners unit in today's money. That isn't much compensation, given
> the upfront $1.16 cut to annual dividends, which is much more tangible.***
>
> Third, more philosophically, if this sort of deal is required to reap synergies from
> the various bits of the Energy Transfer group, then what exactly is the benefit of
> the Energy Transfer group?

73.     Similarly, on November 21, 2016, the NY Times published an article entitled

"Market Reaction to Deal May Bode Ill for Energy Transfer Partners," noting that the initial

reaction to the Proposed Transaction has not been positive.  In pertinent part, the article stated:

> The initial reaction does not look promising. Shares of Sunoco and Energy Transfer
> Partners fell nearly 10 percent on Monday shortly after the opening bell, pushing
> the value of the deal below $20 billion, before recovering some of their losses.
> Shares of Energy Transfer Equity rose more than 3 percent, suggesting its
> shareholders may benefit the most from all the deck chair shuffling. With the
> Energy Transfer Equity-Williams debacle fresh in investors' minds, the market's
> reaction looks like a bad omen.

74.     Further, on December 5, 2016, Seeking Alpha published an article, entitled "Energy Transfer Partners' Merger Gives You Multiple Trades To Do," which discussed the debt problems related to the transaction.  In pertinent part, the article stated:

> It's not just SXL and ETP unitholders that are affected by this transaction. The combined partnership will be assuming ETP's $30.5 billion outstanding total debt. Adding SXL's own $6.0 billion total debt, investors will be looking at an entity with $36.5 billion debt versus $5.6 billion Annualized Adjusted EBITDA, which equates to 6.5x leverage before synergies.

75.     Indeed, according to a November 21, 2016 article published by Forbes, entitled "Is There Value In Sunoco Logistics' Merger With Energy Transfer Partners," "[t]he deal, which consists of all stock, looks cheap, valuing ETP at $39.29 per unit, slightly lower than its $39.37 closing price this past Friday (the entities say the price represents a 10% premium over the target's average closing price over the last 30 days)." Nevertheless, despite the obvious insufficiency of the proposed consideration, there appear to have been minimal efforts on the Board's part to improve the offer.

76.     Ultimately, the Board allowed SXL and ETE to control the negotiations and process and secure a merger agreement that furthered their interests at the expense of ETP's public unitholders. In fact, as noted in the Proxy, the Proposed Transaction is really a controlling unitholder/management buyout and this feature precluded the Board from fulfilling its fiduciary duties to ETP's common unitholders. Specifically, as noted in the Proxy:

> ***The ETP Conflicts Committee was <u>not authorized to</u>, and did not, <u>conduct an auction process or other solicitation of interest from third parties</u> for the acquisition of ETP. <u>Given ETE's control over ETP's general partner, it was unrealistic to expect or pursue an unsolicited third party acquisition proposal or offer for the assets or control of ETP</u>, and <u>it was unlikely that the ETP Conflicts Committee could conduct a meaningful auction</u> for the acquisition of the assets or control of ETP.***

77.     Thus, the Board plainly failed to even attempt to maximize ETP's unaffiliated unitholders' value and simply relied on Barclay's fairness opinion in approving and recommending the Proposed Transaction despite Barclay's admission that:

> In arriving at its opinion, ***Barclays did not ascribe a specific range of values to the ETP common units or the SXL common units*** but rather made its determination as to fairness, from a financial point of view, to unaffiliated ETP unitholders of the exchange ratio to be offered to such unaffiliated ETP unitholders in the proposed transaction on the basis of various financial and comparative analyses.

Tellingly, despite this disclaimer, Barclays did ascribe "a specific range of values to the ETP common units," but ultimately elected to disregard the valuation ranges implied by its analyses.

78.     Based on Barclays' *Discounted Distributable Cash Flow Analysis*, ETP common units may be worth as much as ***$46 per unit*** (even based on the assumption that ETP distributions would be reduced during the projection period), or approximately ***17%*** more than the implied value of the consideration in the Proposed Transaction. Indeed, the implied value of the Proposed Consideration is less than the low end of the implied valuation range for ETP units derived from the *Discounted Distributable Cash Flow Analysis.*

79.     Similarly, based on Barclays' *Selected Comparable Company Analysis*, ETP common units may be worth as much as ***$45 per unit***, or approximately ***15%*** more than the implied value of the consideration in the Proposed Transaction.

80.     The Board should have leveraged ETP's position to extract more consideration and a more favorable merger agreement and should have negotiated a fair change of control premium on behalf of ETP's unitholders. Instead, the Board agreed to a deal with SXL without fulfilling its fiduciary duties to maximize unitholder value. Given these factors as well as ETP's prospects for growth and the synergies and other benefits anticipated in the deal, the merger consideration is inadequate and significantly undervalues the Company.

**The Merger Agreement's Preclusive Terms and Deal Protection Provisions Favor SXL**

81.     Compounding the harm associated with the unfair consideration, the terms of the Merger Agreement unreasonably favor SXL over any other potential bidders for ETP.

82.     To protect SXL's ability to secure the benefits it anticipates in the Proposed Transaction, and to ensure that no competitive bidder will step in to reap those benefits, SXL negotiated, and the Board granted, unreasonable deal protections. The Merger Agreement contains preclusive measures, considered collectively and in context, that will hinder the emergence of a superior offer.

83.     First, ETP and the Individual Defendants agreed to a strict "no solicitation" provision in the Merger Agreement that prohibits ETP or the Individual Defendants from taking any actions that might lead to a better deal for ETP unitholders. Specifically, the Merger Agreement provides that ETP shall not, and shall cause its subsidiaries and affiliated entities not to "use its reasonable best efforts to cause its Representatives not to, directly or indirectly (i) solicit, initiate, knowingly facilitate, knowingly encourage (including by way of furnishing confidential information) or knowingly induce or take any other action intended to lead to any inquiries or any proposals that constitute or could reasonably be expected to lead to an ETP Alternative Proposal" (as defined in the Merger Agreement).

84.     Second, the Merger Agreement grants SXL matching rights, including the right to be provided with confidential, non-public information concerning any competing acquisition proposal from a third party and the right to be provided with any non-public information or data provided to a possible competing bidder that was not previously made available to SXL, which information SXL then could use to prepare a matching bid. In the event of a superior offer, the Merger Agreement also automatically gives SXL several business days to renegotiate the terms of the Proposed Transaction.

85.     Third, the Merger Agreement also contains a highly restrictive "fiduciary out" provision permitting the Board to change its recommendation in favor of the Proposed Transaction and/or pursue a superior proposal only under extremely limited circumstances. The Company must give SXL written notice of any superior proposal, including the material terms and conditions of the superior proposal and the identity of the party making it. Further, SXL must be provided five days' notice to renegotiate its own proposal (*i.e.*, "matching rights").

86.     Fourth, the Merger Agreement requires that ETP pay SXL a $630 million termination fee in the event ETP terminates the Merger Agreement to pursue a superior proposal. And, if the Merger Agreement is terminated under specified circumstances, including if the ETP unitholder approval is not obtained, then ETP will be required to pay all of the reasonably documented out-of-pocket expenses incurred by SXL and its affiliates in connection with the Merger Agreement and the transactions contemplated thereby, up to a maximum amount of $30 million.

87.     Finally, the Proposed Transaction is subject to approval by a majority of the ETP common units and Series A units, ***voting together as a single class***, which will include the ETP units held by ETE and its affiliates (including SXL), and there is no requirement of a separate approval by a majority of the unaffiliated ETP unitholders.

88.     Despite the fact that the ETP Conflicts Committee was not authorized to, and did not, conduct an auction process or other solicitation of interest from third parties, the Individual Defendants agreed to these deal protection provisions, which further restrain the Company's ability to solicit or negotiate with any third party other than SXL concerning a possible acquisition of the Company. The deal protection measures in the Merger Agreement and the control over ETP possessed by ETE and SXL will preclude the emergence of a superior offer.

**Conflicts of Interest and Related Omissions/Misstatements**

89.     ETE holds a controlling ownership interest in ETP. ETE controls ETP through ETE's ownership of ETP GP LLC, which is the general partner of ETP GP. ETE also owns all of the limited partner interests of ETP GP. ETP GP owns 100% of the general partner interest and incentive distribution rights in ETP and all of the Class J units in ETP. ETE also owns all of the Class H units and Class I units in ETP, as well as approximately 0.5% of the outstanding ETP common units. In addition, ETE indirectly owns a 0.1% membership interest in SXL GP, which owns 100% of the general partner interest and incentive distribution rights in SXL. ETE has different economic interests in the merger than ETP common unitholders generally due to, among other things, ETE's ownership of economic interests in ETP other than ETP common units and ETE's ongoing ownership of the general partner interest and incentive distribution rights in SXL following the merger. These relationships are conflicts of interest.

90.     Further, ETP owns the general partner, 100% of the incentive distribution rights, and 67.1 million common units of SXL. ETP's general partner is owned by ETE. ETE is a master limited partnership that owns the general partner and 100% of the incentive distribution rights (IDRs) of ETP and Sunoco LP. ETE also owns approximately 2.6 million ETP common units and approximately 81.0 million ETP Class H Units, which track 90% of the underlying economics of the general partner interest and IDRs of SXL.

91.     Moreover, aside from their interests as unitholders of ETP, ETP's directors and executive officers have interests in the merger that are different from, or in addition to, the interests of ETP unitholders.

92.     Defendant Warren is Chief Executive Officer and Chairman of the Board at ETP GP, as well as the Chairman of the Board of ETE GP. Defendant McCrea is a Director at ETP GP, Chairman of the Board at SXL GP, and Chief Operating Officer and Chief Commercial Officer

and a Director at ETE GP.  Defendant Perry is a Director at ETP GP and a Director at SXL GP. Defendant Ramsey is the President, Chief Operating Officer and Director at ETP GP and a Director at ETE GP.

93.     Following the completion of the merger, defendant Warren is expected to become the Chief Executive Officer of SXL; defendant McCrea is expected to become the Chief Commercial Officer of SXL; and defendant Ramsey is expected to become the President of SXL. Further, Thomas E. Long, Chief Financial Officer of ETP, is expected to become the Chief Financial Officer of SXL. And, current members of the Board are expected to serve as members of the post-merger Board following the merger, when the Board becomes responsible for managing ETP GP as the general partner of SXL.

94.     Further, certain of the directors and executive officers of ETP GP held common units in SXL and ETE as of December 15, 2016.  Defendant Warren owned 21,167 ETP common units and 187,739,220 ETE common units; defendant Collins owned 113,537 ETP common units, 23,404 SXL common units and 344,532 ETE common units; defendant Grimm owned 26,016 ETP common units; defendant McCrea owned 351,710 ETP common units, 58,495 SXL common units, and 2,347,200 ETE common units, defendant Perry owned 10 ETP common units; defendant Ramsey owned 14,370 ETP common units and 53,331 ETE common units; and defendant Skidmore owned 10,530 ETP common units.

95.     Additionally, under the Merger Agreement, each ETP restricted unit held by ETP's directors and executive officers that is outstanding as of immediately prior to the effective time will cease to relate to or represent a right to receive ETP common units and will be converted, at the effective time, into the right to receive an award of restricted units relating to SXL common units on the same terms and conditions as were applicable to the corresponding award of ETP restricted units, except that the number of SXL common units covered by the award will be equal

to the number of ETP common units covered by the corresponding award of ETP restricted units multiplied by the exchange ratio, rounded up to the nearest whole unit.  As of December 10, 2016, defendant McCrea had 227,240 outstanding ETP restricted units; defendant Ramsey had 77,190 outstanding ETP restricted units; defendant Collins had 6,600 outstanding ETP restricted units; defendant Grimm had 6,600 outstanding ETP restricted units; defendant Perry had 5,358 outstanding ETP restricted units; and defendant Skidmore had 7,176 outstanding ETP restricted units.

96.     In the November 21, 2016 NY Times article cited above, the various conflicts of interests were detailed as follows: ETP owns around a fifth of SFX's units and exerts control over SFX through its ownership of the general partner; SFX is listed as a subsidiary of ETP, ETE controls ETP; and Defendant Warren runs ETE and ETP.  In pertinent part, the article stated:

> Energy Transfer Partners owns around a fifth of its would-be acquirer's common units — the equivalent of shares. It also exerts control over Sunoco through its 100 percent ownership of the general partner that staffs and runs Sunoco's pipelines. Sunoco lists itself as an Energy Transfer Partners subsidiary in its regulatory filings.
>
> Energy Transfer Equity, which had extreme buyer's remorse with Williams and was only able to get out of that $33 billion acquisition because of a legal loophole, controls Energy Transfer Partners through ownership of its general partner. Kelcy L. Warren, chief executive of Energy Transfer Equity, runs that company and Energy Transfer Partners. But he needs the approval of other Energy Transfer Partners unit holders for the Sunoco transaction to go through.

97.     Thus, the Proposed Transaction is essentially an insider (*i.e.*, SXL) buyout of ETP that was facilitated by ETE, its affiliates, and conflicted insiders common to ETP, SXL, and/or ETE. The Merger Agreement is the product of an unfair process that lacked safeguards to ensure that ETP's public unitholders were not taken advantage of (as they were) by ETE and SXL. In fact, as explained below, even ETP's advisor, Barclays, is conflicted due to its substantial, only partially disclosed, ties to ETE and SXL.

**The Materially Incomplete and Misleading Proxy**

98.     Defendants filed, or caused to be filed, the Proxy with the SEC in connection with the Proposed Transaction. As alleged herein, the Proxy omits and/or misstates material information that must be disclosed to ETP's unitholders to enable them to render an informed decision with respect to the Proposed Transaction.

99.     In addition to the omissions/misstatements identified above, with respect to the background of the Proposed Transaction, the Proxy also fails to disclose whether Barclays or the Board received any unsolicited indications of interest from other potential buyers and merely notes that both Barclays and the ETP Conflicts Committee were proscribed from soliciting any such interest.

100.    The Proxy also fails to disclose and/or otherwise misstates, critical information concerning managements' projections and essential inputs, assumptions, and details concerning the financial analyses performed by Barclays in support of its fairness opinion which the Board relied on in approving and recommending the Proposed Transaction. All this omitted information, if disclosed, would significantly alter the total mix of information available to ETP's unitholders that they would rely upon in deciding how to vote on the Proposed Transaction.

*Managements' Projections*

101.    Despite the fact that ETP unitholders are being paid for their ETP holdings with SXL units, and the fact that the exchange ratio is inextricably tied to ETP and SXL's projected financial performance, the Proxy fails to disclose the complete financial projections prepared by management of ETP, for either projection case, and those prepared by management of SXL (which were relied on by Barclays), or a GAAP reconciliation of those certain, limited, "derived" non-GAAP metrics included in the Proxy. Specifically, for both ETP and SXL, for 2017 through 2019, the Proxy fails to disclose the projected:

    i.    revenues;

    ii.    incomes;

    iii.    net income; and

    iv.    expenses.

102.    In addition, the Proxy fails to disclose the basis of ETP management's assumption that it would likely have to reduce its distributions during the projection period despite the fact that Company had steadily increased its distributions over the past few years.

103.    Similarly, the Proxy fails to disclose:

    i.    the schedule of the incentive distribution subsidies provided by, and projected to be provided by, ETE to each of ETP and SXL (the "IDR Projected Subsidies"); and

    ii.    the certain estimates provided by ETP to Barclays as to the amounts and timing of the cost savings and revenue enhancements (collectively, the "Expected Synergies") anticipated by the management of ETP to result from the proposed transaction.

Both the IDR Projected Subsidies and the Expected Synergies were relied on by Barclays in its financial analyses which purport to support its fairness opinion in favor of the Proposed Transaction.

*Barclays' Analyses*

104.    According to Bloomberg, as of January 5, 2017, SXL had approximately 322.1 million units outstanding. And, according to the Registration Statement, SXL will be issuing up to approximately 826.2 million units in connection with the Merger. Thus, when ETP unitholders ultimately receive the SXL units, their will be almost 400% more SXL units outstanding than at "year end 2016." Nevertheless, in connection with its analyses, Barclays noted that "[f]or purposes of the SXL calculations, the number of units estimated to be outstanding at year end 2016, per the SXL Projections, was used to derive implied per unit values." And, although the value of the post-Merger partnership units should reflect the added value contributed by ETP, the Proxy fails to

disclose the projected value of the post-Merger partnership units, or indicate how much of that value will be contributed by each of ETP and SXL.

105.     With respect to Barclays' *Pro Forma Merger Consequences Analysis*, the Proxy fails to disclose: (i) that the analysis implies an exchange ratio of approximately 1.54 to 1.94 SXL units per ETP unit based on the Status Quo Case; (ii) how the implied exchange ratio from this analysis differs so greatly from that derived from the *Discounted Distributable Cash Flow Analysis* (which also analyzed the projected distributable cash flow per unit); (iii) the discounted cash flow figures used in the analysis; how they differed from the distributable cash flow projections; how the discounted cash flow figures were calculated; the inputs and assumptions for that calculation; and, whether they were based on (undisclosed) management cash flow projections; and (vi) the projected value of the post-Merger partnership units, and relative contributions to such value by ETP and SXL. Instead, the Proxy obfuscates the fact that the pro forma impact of the Merger is negative to ETP unitholders and is disproportionately positive for SXL unitholders, and fails to disclose how this effect, and the *Pro Forma Merger Consequences Analysis* generally, do not belie the purported fairness of the Proposed Transaction. Indeed, as noted in the Proxy, between 2017 and 2019, the pro forma impact of the Proposed Transaction is expected to be an up to **20.1% reduction** of distributable cash flow for ETP's unitholders and up to a **10.5% increase** for SXL unitholders.

106.     With respect to Barclays' *Discounted Distributable Cash Flow Analysis*, the Proxy fails to disclose: (i) the basis for two hypothetical reductions in ETP distributions; (ii) the projected cost of equity for ETP and SXL; (iii) the specific discount rates applied to the ETP Status Quo Case and ETP Distribution Reduction Case; (iv) whether the discount rates were applied to both

the estimated distributable cash flows and the terminal values, or just the cash flows;[2] and (v) the net present value "as of" date used for ETP; and whether it was other than January 1, 2017, as noted with respect to SXL.

107.    With respect to Barclays' *Selected Comparable Company Analysis*, the Proxy fails to disclose the individually observed metrics and multiples, including the estimated yields for each of the analyzed companies.

108.    With respect to Barclays' *Selected Precedent Transactions Analysis*, the Proxy fails to disclose: (i) the basis for including a nearly 20 year old transaction; (ii) the basis for including five transactions (nearly a third of all analyzed) that occurred during or prior to the financial collapse; (iii) in light of the inclusion of such stale and irrelevant transactions, the individually observed metrics and multiples so unitholders can fairly compare the Proposed Transaction to others that were consummated in a comparable economic climate; and (iv) the certain "qualitative judgments [by Barclays] concerning differences between the characteristics of the selected precedent transactions and the proposed transaction which would affect the acquisition values of the selected target companies and ETP and SXL."

109.    With respect to Barclays' *Analysis of Equity Research Analyst Price Targets*, the Proxy fails to disclose: (i) the source of the analyst price targets (given that the data appears inconsistent with that available on Bloomberg); and (ii) the dates the price targets were issued, or at least, the earliest date of a target included in the analysis.

─────────────

[2] As noted in the Proxy, for each of the companies, Barclays "***added (i) projected distributable cash flow*** per [] common unit for fiscal years 2017 through 2019 based on the [] Projections ***to (ii) the terminal value" and "discounted such distributable cash flows*** per [] common unit to their net present value" using certain discount rates. Thus, given that Barclays first added the projected cash flows to the terminal values, it is unclear whether the subsequent discount to net present value was applied solely to the distributable cash flow or to the figure derived from the combined metrics.

110.     Based on the foregoing, ETP's unitholders lack critical information necessary to evaluate whether the Proposed Transaction is in their best interest.  Moreover, without the key financial information and related disclosures, ETP's unitholders cannot gauge the accuracy and reliability of the financial analyses performed by Barclays and whether they can reasonably rely on its fairness opinion.

111.     Accordingly, Plaintiff seeks, among other things, the following relief: (i) enjoinment of the Proposed Transaction; or (ii) rescission of the Proposed Transaction in the event that it is consummated and to recover damages resulting from Defendants' misconduct.

## CLASS ACTION ALLEGATIONS

112.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of all unitholders of ETP common units who are being and will be harmed by Defendants' actions described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any of the Defendants.

113.     This action is properly maintainable as a class action because:

(a)      The Class is so numerous that joinder of all members is impracticable. As of December 28, 2016, there were over 544.57 million shares of ETP common units issued and outstanding. The actual number of unitholders of ETP will be ascertained through discovery;

(b)      There are questions of law and fact that are common to the Class, including:

i)   Whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction;

ii)  Whether the Proxy omits and/or misstates material information;

iii) Whether Defendants have failed to engage in a fair process and obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction; and

iv) Whether Plaintiff and the other members of the Class would suffer irreparable injury if the Proposed Transaction complained of herein were consummated.

(c)     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class;

(d)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(e)     Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to, the Class and, therefore, injunctive relief on behalf of the Class as a whole is appropriate.

### FIRST CAUSE OF ACTION

**Against All Defendants for Violations of Section 14(a) of the Exchange Act
and Rule 14a-9 Promulgated Thereunder**

114.     Plaintiff repeats and realleges each allegation set forth herein.

- 35 -

115.    As detailed herein, Defendants disseminated the false and misleading Proxy specified above, which contained statements which, at the time and in the light of the circumstances under which they were made, were false and misleading with respect to material facts and which omitted to state material facts necessary in order to make the statements therein not false or misleading or necessary to correct earlier statements which had become false or misleading, in violation of Section 14(a) of the Exchange Act and SEC Rules promulgated thereunder, including SEC Rule 14a-9.

116.    By the use of the mails and by means and instrumentalities of interstate commerce and the facility of a national securities exchange, Defendants solicited and permitted the use of their names to solicit proxies or consents or authorizations in respect of the common units of ETP.

117.    By virtue of their positions within the Company, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by Defendants. The Proxy misrepresented and omitted material facts, including material information about the unfair sale process for the Company, the unfair consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets. Defendants were at least negligent in filing and disseminating the Proxy with these materially false and misleading statements and omissions. Defendants have also failed to correct the Proxy and the failure to update and correct false statements is also a violation of Section 14 of the Exchange Act and SEC Rules promulgated thereunder.

118.    The omissions and false and misleading statements in the Proxy are material in that a reasonable unitholder would consider them important in deciding whether to vote in favor of and tender their shares in the Proposed Transaction. A reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to unitholders.

119.    Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from immediate and irreparable injury, which Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

**Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act**

120.    Plaintiff repeats and realleges each allegation set forth herein.

121.    The Individual Defendants acted as controlling persons of ETP within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and directors of ETP and their participation in and awareness of the Company's business and operations and their intimate knowledge of the materially false statements and omissions contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading.

122.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be false and misleading prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

123.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same. Among other things, the Proxy at issue contains the unanimous recommendation of the Individual Defendants to approve the Proposed Transaction. Thus, they were directly involved in the making of that document.

124.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Proposed Transaction. The Proxy purports to describe the various issues and information that they reviewed and considered – descriptions which had input from the Individual Defendants.

125.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

126.    Plaintiff has no adequate remedy at law.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in Plaintiff's favor and in favor of the Class and against Defendants as follows:

A.    Enjoining Defendants, their agents, counsel, employees, and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain the best available terms for unitholders and discloses, completely and accurately, the material information concerning the Proposed Transaction presently misstated/omitted in the Proxy;

B.    Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof, or granting Plaintiff and the Class rescissory damages;

D.    Directing the Individual Defendants to account to Plaintiff and the Class for all damages suffered as a result of the wrongdoing;

E.    Awarding Plaintiff and the Class the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.


Dated:  January 6, 2017.

Respectfully submitted,

PULS HANEY, P.L.L.C.


*/s/ W. Kelly Puls*
Mark A. Haney
State Bar No. 08908480
mark@pulshaney.com
W. Kelly Puls
State Bar. No. 16393350
kelly@pulshaney.com
Kolter R. Jennings
State Bar No. 24094048
kolter@pulshaney.com

PULS HANEY, P.L.L.C.
301 Commerce Street, Suite 2900
115 West Second Street
Fort Worth, Texas 76102
Telephone: (817) 498-9911
Facsimile:  (817) 332-1333

– AND –


BROWER PIVEN
   A Professional Corporation
Daniel Kuznicki
475 Park Avenue South, 33rd Floor
New York, NY 10016
Tel. (212) 501-9000

*Attorneys for Plaintiff*